**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
          pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CIOE INVESTMENTS INC., Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC., GAVIN D. SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cioe Investments Inc. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Health Insurance Innovations, Inc. ("Health Insurance Innovations" or the "Company"), analysts' reports and

1

advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Health Insurance Innovations from August 2, 2017 through September 11, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions and subsequent damages took place within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Health Insurance Innovations operates as a developer, distributor, and administrator of cloud-based individual health and family insurance plans, and supplemental products in the United States. The Company is incorporated in Delaware and its principal executive offices are located at 15438 North Florida Avenue Suite 201 Tampa, Florida. The Company's securities are traded on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "HIIQ."

8. Defendant Gavin D. Southwell ("Southwell") has been the Company's Chief Executive Officer throughout the Class Period.

9. Defendant Michael D. Hershberger ("Hershberger") has been the Company's Chief Financial Officer throughout the Class Period.

10. Defendants Southwell and Hershberger are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

15. On August 2, 2017, the Company issued a press release announcing its second quarter 2017 financial and operation results, stating in part:

> Health Insurance Innovations, Inc. Reports Record Second Quarter 2017 Financial and Operating Results
>
> Revised 2017 Guidance Metrics Upwards
> Record Revenue of $61.8 million, up 39% YOY
> Diluted Earnings per Share of $0.35, up 46% YOY
> Record Adjusted Earnings per Share of $0.46, up 70% YOY
> Record Policies in force totaled approximately 359,500, up 39% YOY
>
> TAMPA. Fla., Aug. 02, 2017 (GLOBE NEWSWIRE) -- Health Insurance Innovations, Inc. (NASDAQ:HIIQ), a leading developer, distributor, and cloud-based administrator of affordable health insurance and supplemental plans announced financial results for the second quarter ended June 30, 2017. The Company will host a live conference call on Thursday, August 3, 2017 at 8:30 A.M. EDT.

4

**Second Quarter 2017 Consolidated Financial Highlights**

- Record revenue was $61.8 million, an increase of 38.9% over $44.5 million in the second quarter of 2016.
- Record total collections from customers (premium equivalents) of $98.9 million, an increase of 28.5% over $77.0 million in the second quarter of 2016.
- Record adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) was $12.5 million, compared to $6.5 million in the second quarter of 2016, an increase of 92.3%.
- GAAP diluted earnings per share was $0.35, compared to $0.24 in the second quarter of 2016, an increase of 45.8%.
- Record adjusted earnings per share also referred to as Adjusted Net Income per Share, was $0.46 compared to $0.27 in the second quarter of 2016, an increase of 70.4%.
- Record policies in force as of June 30, 2017, totaled approximately 359,500, a 39.1% increase from 258,400 as of June 30, 2016.
- Premium equivalents, adjusted EBITDA, and adjusted EPS are non-GAAP financial measures. See the reconciliations of these measures to their respective most directly comparable GAAP measure below in this press release.

**Revised 2017 Full Year Guidance**

We are revising our guidance upwards for the full year 2017. We expect Revenue to grow 22% to 25% year-over-year ($225 million to $230 million), Adjusted EBITDA to grow 41% to 51% year-over-year ($39 million to $42 million) and Adjusted EPS to grow 29% to 38% ($1.45 to $1.55). Previously we guided to Revenue of $212 million to $222 million, Adjusted EBITDA of $36 million to $39 million and Adjusted EPS of $1.40 to $1.50.

"In our record second quarter results, we continue to drive top line growth and bottom line results with disciplined execution of our strategy. In the second half of 2017, we will continue to focus on our product and technology innovation to meet consumers' affordable health care needs" said Gavin Southwell, HIIQ's Chief Executive Officer and President.

**Second Quarter 2017 Financial Discussion**

Second quarter revenues of $61.8 million increased 38.9%, compared to the second quarter of 2016, driven primarily by an increase in policies in force.

Total SG&A expense was $14.7 million (23.8% of revenues) in the second quarter of 2017, compared to $11.7 million (26.3% of revenues) in the same period in 2016. Our core SG&A for the quarter - total SG&A less marketing leads

and advertising, stock compensation, transaction, severance, restructuring and other costs - was $11.1 million (18.0% of revenues) in the second quarter of 2017, compared to $8.7 million (19.5% of revenues) in the same period of 2016.

EBITDA was $10.7 million in the second quarter of 2017, compared to $5.7 million in the same period in 2016, an increase of 87.7%.

Adjusted EBITDA was $12.5 million in the second quarter of 2017, an increase of 92.3% over $6.5 million in the same period in 2016. Adjusted EBITDA as a percentage of revenue was 20.3% in the second quarter of 2017, compared to 14.7% in the same period in 2016. Adjusted EBITDA is calculated as EBITDA, adjusted for items that are not part of regular operating activities, including restructuring costs, tax receivable adjustments and other non-cash items such as stock-based compensation. A reconciliation of net income to EBITDA and adjusted EBITDA for the three months ended June 30, 2017 and 2016 is included within this press release.

GAAP diluted earnings per share for the second quarter was $0.35, compared to $0.24 in the second quarter of 2016.

Adjusted EPS for the second quarter of 2017 was $0.46, compared to $0.27 in the prior year. A reconciliation of net income to adjusted net income per share is included within this press release.

The Company makes short-term loans to our distributors, based on actual sales, that we refer to as advanced commissions. These advanced commissions assist our distributors with cost-of-lead acquisition and provide working capital. We recover the loans from future commissions earned on premiums collected over the period in which policies renew. The second quarter advanced commission balance of $30.7 million is a decrease of $6.3 million from December 31, 2016 and a decrease of $5.0 million sequentially.

Cash and cash equivalents totaled $27.5 million at June 30, 2017, an increase of $15.3 million from December 31, 2016 and an increase of $11.7 million sequentially.

On May 5, 2017 the Company filed a Registration Statement on Form S-3, effective May 19, 2017, to offer and sell, from time to time, up to $150 million of any combination of debt securities, Class A Common Stock, Preferred Stock, Warrants, Units or Purchase Contracts as described in the prospectus. Securities may be sold in one or more classes or series and in amounts, at prices and on terms that we will determine at the times of the offerings and we may offer the securities independently or together in any combination for sale directly to purchasers or through underwriters, dealers or agents to be designated at a future date. We intend to use the net proceeds from the sale of the securities for general corporate purposes, including potentially expanding existing businesses, acquiring

businesses and investing in other business opportunities. At June 30, 2017, the Company had not sold any securities under this Registration Statement.

On July 17, 2017, subsequent to the quarter-end, the Company entered into a Credit Agreement with SunTrust Bank. The Credit Agreement provides for a $30.0 million revolving credit facility pursuant to which the Lender has agreed to make revolving loans and issue letters of credit. The Credit Facility will be used for general corporate purposes, including to fund ongoing working capital needs, capital expenditures, and permitted acquisitions. The Credit Facility also provides the Company with the right to request additional incremental term loans thereunder up to an aggregate additional amount of $20 million, subject to the satisfaction of certain additional conditions provided therein. Concurrent with the execution of the Credit Agreement, the Company terminated its existing $15.0 million line of credit established on December 15, 2014.

We believe that both the shelf filing and the increased and extended revolving line of credit will allow the Company the flexibility to access capital, if needed, and will contribute to the generation of future shareholder value. We expect to continue to generate cash flow from operations throughout 2017.

16. On August 4, 2017, the Company filed a Form 10-Q for quarterly period ended June 30, 2017 (the "2017 Q2 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The 2017 Q2 10-Q was signed by Defendants Southwell and Hershberger. The 2017 Q2 10-Q also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Southwell and Hershberger attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

17. The 2017 Q2 10-Q stated the following regarding the Company's application for a third-party insurance administrators license with the Florida Office of Insurance Regulation:

TPA Licensure

Many states have statutes that require the licensure of third-party insurance administrators ("TPA"). The statutes and applicable regulations vary from state-to-state with respect to the nature of the business activities that may require licensure. Where the Company believes that statutes are unclear or open to interpretation, it takes the prudent approach of applying for a TPA license. Therefore, the Company applied for a TPA license with the Florida Office of

7

Insurance Regulation ("OIR"). In June 2017, the OIR denied the Company's application based on its determination that the Company had not yet provided all information required to process the application. In June 2017, the Company appealed the denial with the Florida Division of Administrative Hearings. A final hearing on the matters has been scheduled for October 17-20, 2017, but the Company is working with the OIR to reach a mutually agreeable resolution of the matter prior to the hearing, including discussing whether the OIR will require the Company to hold such a license at all.

18. The statements referenced in ¶¶ 15-17 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's application for a third-party insurance administrators license with the Florida Office of Insurance Regulation was denied due in part to material errors and omissions; (2) the Florida Office of Insurance Regulation's rejection of the Company's application for a third-party insurance administrators license could result in its losing licenses in the other states; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

19. On September 11, 2017, *SeekingAlpha.com* published an article asserting that: (1) in June 2017, the Company was rejected for a key insurance license in its home state of Florida, as the regulator uncovered undisclosed legal actions against Health Insurance Innovations insiders; (2) the Company warned the Florida regulator of the disastrous "domino effect" from this rejection by which licensing denials will then spread to the other states in which Health Insurance Innovations does business, stating in part:

8

**Health Insurance Innovations: Penalties To Exceed $100 Million And Undisclosed 'Domino Effect'**

Sep. 11, 2017 9:40 AM ET7 comments
by: Richard Pearson
**Summary**

- New data points: Fraud penalties expected to reach $100 million or more. Other insurers required to cease doing business with HIIQ as part of their fraud settlements.

- June 2017: HIIQ rejected for key insurance license in home state of Florida as regulator uncovers undisclosed legal actions against HIIQ insiders.

- HIIQ privately warns of disastrous "domino effect" spreading to other states, causing additional loss of licenses. HIIQ makes no disclosure to investors.

- Regulatory catalysts now approaching in October 2017. Insiders have been publicly hyping the stock while simultaneously dumping $50 million in shares.

- HIIQ is nearly identical to five of my past trades where Craig Hallum was on the other side. Each one plunged by 80-100%. SEC investigations, fraud suits, and delistings.

*****

*From the Florida OIR:*


7004 1350 0000 8755 6852



OFFICE OF INSURANCE REGULATION

**FINANCIAL SERVICES COMMISSION**

RICK SCOTT
GOVERNOR

JEFF ATWATER
CHIEF FINANCIAL OFFICER

PAM BONDI
ATTORNEY GENERAL

ADAM PUTNAM
COMMISSIONER OF AGRICULTURE

**DAVID ALTMAIER**
COMMISSIONER

June 1, 2017

VIA EMAIL TO robby.birnbaum@gmlaw.com and
david.schnobrick@gmlaw.com and Certified Mail, Return Receipt Requested

Robby H. Birnbaum, Partner
Greenspoon Marder, P.A.
100 W. Cypress Creek Road, Suite 700
Ft. Lauderdale, FL  33309

RE:  Application for Licensure as a Third-Party Administrator
     By Health Plan Intermediaries Holdings, LLC

Dear Mr. Birnbaum:

The Office of Insurance Regulation ("Office") has reviewed the application for a Certificate of Authority ("Application") submitted by Health Plan Intermediaries Holdings, LLC ("Applicant") on April 19, 2017. Pursuant to sections 120.60 and 627.8805, Florida Statutes, and as set forth below, the Office hereby DENIES the Application.

### Bases for Application Denial

Based on a full review of the materials submitted by Applicant, the Office has determined that the Application should be DENIED for the following reasons:

1. **The Applicant failed to correct errors or omissions in the application and did not supply additional information when requested by the Office.**

The Application contained numerous, material errors and omissions. The Office timely notified Applicant of these errors and omissions. As detailed above, the Applicant failed to correct the errors and omissions. As further detailed above, the Applicant failed to supply additional information when requested by the Office.

Legal authority: §§ 120.60(1), 626.8805(2) & 626.8805(3), Fla. Stat.

2. **The Office has determined that the Applicant is not competent.**

Applicant failed to meet the deadlines established by the Office in its clarification letters. Applicant failed to meet deadlines that were extended pursuant to its requests. When Applicant has eventually submitted documents to the Office, that information has often been incomplete or non-responsive.

Legal authority: § 626.8805(4), Fla. Stat.

\*\*\*\*\*

As shown, following its rejection for licensure as a 3rd party administrator in Florida, HIIQ / HPIH wrote a letter of appeal to the Florida regulator dated June 16, 2017. In that letter, HIIQ warned that a rejection in Florida would comprise a "reporting event", obligating HIIQ to inform the other states in which it does business. In HIIQ's own words, this would then trigger a "domino effect" which could result in its losing licenses in the other states where it does business. In other words, according to HIIQ itself, the consequences of a regulatory rejection in Florida will be catastrophic.

(Note that in HIIQ's SEC filings, the name of HIIQ and its VIE "HPIH" ("Health Plan Intermediaries Holdings") are used interchangeably.)

> Additionally, HPIH holds a substantial number of other insurance-related licenses at the entity level; for example, HPIH is a licensed insurance producer entity (or the state equivalent) in every state in the nation. The application denial would trigger a duty to report (and thus raise the specter of additional renewal denials) in many of those states as well, and every state in which HPIH would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of HPIH as an entity would be substantially affected is a radical understatement.

20.  On this news, shares of the Company fell $6.55 per share, or almost 22%, from its previous closing price to close at $23.35 per share on September 11, 2017, damaging investors.

21.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Health Insurance Innovations during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

11

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

25. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

26. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

27. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

28. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

29. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

30. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

31. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

32. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

33. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

34. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

35. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the

Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

36. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

37. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

38. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

39. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

40. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

41. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

42. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

43. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

44. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

45. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

46. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2017        Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email:  lrosen@rosenlegal.com
            pkim@rosenlegal.com

Counsel for Plaintiff